JAMES SHERLOCK v. WILLIAM J. STUART, MAYOR, AND
WILLIAM A. SHINKMAN, CLERK, OF THE
CITY OF GRAND RAPIDS.

*Liquor traffic—Police power—Municipal corporations—Ordinances
—License—Discretion of council.*

1. No one possesses a natural, inalienable, or constitutional right
to keep a saloon for the sale of intoxicating liquors; citing
Black, Intox. Liq. §§ 46, 48.

2. The principel upon which is based the regulation of the liquor
traffic is found in the police power of the State.

3. The restrictions and conditions which may be imposed upon the
liquor traffic are entirely within the discretion of the people, act-
ing through the Legislature; and they have the right to prohibit
the low, the vicious, and the criminal from engaging in it.

4. The fee required to be paid as a condition precedent to engaging
in the business of selling intoxicating liquors is called a "tax,"
but there are other conditions precedent which are inconsistent
with a purely tax system, and partake of the character of a
license; citing Black, Intox. Liq. § 108; *State v. Hipp*, 38 Ohio
St. 199; *Butzman v. Whitbeck*, 42 Id. 223; *Robison v. Miner*,
68 Mich. 552.

5. The Legislature may confer upon municipalities the right to
determine the places where saloons may be kept, and to deter-
mine that question upon each application; and may enact that
only reputable persons shall be allowed in the business, and
may authorize the municipal authorities to determine the ques-
tion of fitness.

6. Other considerations than the mere locality must often
enter into the determination of the suitableness of the place
for a saloon; and if the building be so arranged as to render
violations of the law easy, or if the saloon is to be kept in con-
nection with a house of prostitution, or if it be not situated
upon a street or alley, or if it be in one of the upper stories
of a building, or in a part of the city occupied for residence
purpcses only, or near a school, such conditions would certainly
afford good reasons for the rejection of an application for a
license.

96 MICH.—13.

| 96 | 193 |
|----|-----|
| 105 | 73 |
| 96 | 193 |
| 106 | 35 |
| 96 | 193 |
| 107 | 140 |
| 96 | 193 |
| 120 | 48 |
| 96 | 193 |
| 141 | 346 |
| 96 | 193 |
| f143 | 7314 |
| f144 | 4694 |
| 96 | 193 |
| f149 | 325 |
| 150 | 6458 |
| 96 | 193 |
| f158 | 9496 |

7. Under the charter of the city of Grand Rapids, which confers upon the common council power to enact such ordinances as it may deem desirable to restrain, license, and regulate saloons, and to regulate and prescribe the location thereof, the council may enact an ordinance requiring that all applications for license shall be made to the council, and prescribing the conditions precedent to their consideration.

8. An ordinance requiring all applications to be in writing, and to state the number or location of the proposed saloon, and that they be accompanied with a recommendation, signed by 12 reputable and respectable citizens of the city, certifying that the applicant is well known to them, and is of means, and qualified to keep a saloon, and is of good reputation, fame, and moral character, and is an orderly person; and requiring him to pay a specified sum for such license, and a fee for issuing the same, and to give a bond, to be approved by the council, conditioned that the applicant shall keep and maintain an orderly and well-regulated saloon during the continuance of his license, and pay all fines imposed according to law for a violation of any of the provisions of the ordinance; and providing that the license, when issued, shall state the number or location of the saloon, as designated in the application, and shall not be transferred to any other part of the city without the consent of the council,—is clearly authorized by the charter, and its plain intent is to confer upon the common council power to determine each individual application, so far as the location and suitableness of the place are concerned.

9. When the mayor and common council have in good faith exercised the discretion conferred upon them by law, the courts cannot review such discretion; and the action of the mayor in vetoing a resolution of the council granting a license, on the ground of the unsuitableness of the place where the saloon is proposed to be located, can only be reviewed by the council.

10. The question in *People v. Furman*, 85 Mich. 110, was whether the general liquor law of 1887 repealed all prior acts of the Legislature inconsistent therewith, general as well as local; and the power of the Legislature to confer, by subsequent legislation, upon municipal corporations, the right to deal with the liquor traffic in a manner not provided for in the general law, is to clear for argument.

*Mandamus.*     Argued January 17, 1893.     Denied June 23, 1893.

Relator applied for *mandamus* to compel the issuance of a liquor license. The facts are stated in the opinion.

*Morse, McGarry & McKnight,* for relator.

*William Wisner Taylor,* for respondents.

GRANT, J. The charter of the city of Grand Rapids confers upon the common council the power—

"To enact * * * such ordinances, by-laws, and regulations as they deem desirable * * * to restrain, license, and regulate saloons, and to regulate and prescribe the location thereof."

It further provides that—

"No person shall engage in or exercise the business or occupation of * * * saloon keeper, within the limits of said city, until he is first licensed as such by the common council, under such penalty as the common council may by ordinance prescribe."

In conformity with its charter the common council enacted an ordinance, the first section of which reads as follows:

"No person shall engage in the business of saloon keeping, in any house or place within the limits of this city, without first having obtained a license for that purpose from the common council."

Section 2 of the ordinance reads as follows:

"Every person desiring to keep a saloon in the city shall, before a license is obtained for that purpose, make an application in writing to the common council for such license, stating the number or location of the saloon where the business for which the license is asked is to be carried on, which application must be accompanied with a recommendation, signed by at least twelve reputable and respectable citizens of this city, certifying that the applicant is well known to them, and is of means, and qualified to keep a saloon, and is of good reputation, fame, moral character, and an orderly person. Such applicant shall also, before receiving his or her license, pay into the city treasury such sum for said license as the common council shall annually fix for that

purpose, and take the treasurer's receipt therefor, and also a fee of fifty cents for issuing such license. Such applicant shall also, before receiving said license, execute a bond to the city of Grand Rapids, in such sum and with such sureties as shall be approved by the common council, conditioned that such applicant shall keep and maintain an orderly and well-regulated saloon during the continuance of his or her license, and shall pay all fines imposed and costs therewith assessed upon him or her, according to law, for a violation of any provision of this ordinance. Said license, when issued, shall state the number or location of the saloon, as designated in the application, and shall not be transferred to any other part of the city without the consent of the common council; and no license issued as aforesaid shall extend beyond the first Monday in May next after the issue of the same."

The relator presented his petition to the council under this ordinance, and the council, by a majority vote, granted the license. The mayor, under the power conferred on him, vetoed this action of the council, and no further action thereon has been taken. The relator now asks this Court to compel the respondents to issue the license. The reason given by the mayor for his veto is that the place specified in the petition is unsuitable for a saloon. He presented this reason at length in his message, from which it appears that he has acted in entire good faith, and not from mere caprice, or arbitrarily.

It is contended that the power conferred upon the common council should be exercised by a general ordinance fixing districts or limits within which saloons may be kept, and that the council does not possess the power to hear and determine each individual case.

The principle upon which is based the regulation of the liquor traffic is found in the police power of the State. No one possesses a natural, inalienable, or constitutional right to keep a saloon for the sale of intoxicating liquors. "To sell intoxicating liquor at retail is not a natural right to pursue an ordinary calling." Black, Intox. Liq. §§ 46,

48. By the Constitution of 1850 such sales were absolutely prohibited. By the amendment of 1876 the prohibitory clause was removed from the Constitution, and the power vested in the Legislature to deal with the traffic as it deemed expedient and wise. In some counties of the State the traffic is now prohibited, while in the others it is regulated by the general law of 1887, and by the charters of municipal corporations. The Legislature may now determine who may carry on the business, and the time when, and the place where, it may be carried on. It is manifest that the welfare of society requires that this business should be in the hands of reputable, law-abiding persons. It is notorious that the low, the vicious, and the criminal are often engaged in it. The people, under our Constitution, have the right to prohibit such persons from engaging in it. The restrictions and conditions upon it are entirely within the discretion of the people, through the Legislature.

"It is not for the courts to determine its expediency, or, as said by Mr. Cooley in his work on Constitutional Limitations, 'to run a race of right, reason, and expediency with the legislative branch of the state government.'" *Robison v. Haug*, 71 Mich. 42; Cooley, Const. Lim. 597.

"If the governing power can prohibit a thing altogether, it can impose such conditions upon its existence as it pleases." *Ex parte Christensen*, 85 Cal. 208; *Crowley v. Christensen*, 137 U. S. 86 (11 Sup. Ct. Rep. 13).

The system, in this State, is not purely a tax system. The fee to be paid as a condition precedent to entering upon the business is called a "tax," but there are other conditions precedent which are inconsistent with a purely tax system. These provisions partake of the character of a license. It is said by Black:

"Any law which requires certain acts, other than the mere payment of the tax, to be done by the party, as a prerequisite to his right to enter upon the pursuit of the

trade in question, and makes it a penal offense to engage in the business without such formalities, is in reality a license law, no matter whether it be called a 'tax,' or by any other name." Black, Intox. Liq. § 108.

In Ohio a law nearly parallel in its provisions with the act of 1887 was held to be a license and not a tax law, and therefore void under the constitution of Ohio. *State v. Hipp*, 38 Ohio St. 199; *Butzman v. Whitbeck*, 42 Id. 223. Mr. Justice CAMPBELL, in commenting on the law of 1887, calls this provision "the tax or license for doing business." *Robison v. Miner*, 68 Mich. 552.

Under this comprehensive police power of the State it is, in my judgment, too clear for argument that the Legislature may confer upon municipalities the right to determine the places where saloons may be kept, and to determine that question upon each application. The Legislature may also enact that only reputable persons shall be allowed in the business, and may authorize the municipalities to determine the question of fitness. If the State possesses this right, the power to determine these questions must, in the first instance, be lodged in the municipality, or some board representing it, or in some other body or court. There is no presumption that the persons charged with this duty will not perform it, or that they will abuse the discretion given them. Other considerations than the mere locality must often enter into the determination of the suitableness of the place for a saloon. If the building be so arranged as to render violations of the law easy, or if it is to be kept in connection with a house of prostitution, or if it be not situated upon a street or alley, or if it be in one of the upper stories of a building, or in a part of the city occupied for residence only, or near a school, these would certainly afford good reasons for rejecting the application. Mr. Cooley says:

"The state has also a right to determine what employ-

ments shall be permitted, and to forbid those which are deemed prejudicial to the public good.  *  *  *  The general rule, undoubtedly, is that any person is at liberty to pursue any lawful calling, and to do so in his own way, not encroaching upon the rights of others. This general right cannot be taken away. It is not competent, therefore, to forbid any person, or class of persons, whether citizens or resident aliens, offering their services in lawful business, or to subject others to penalties for employing them. But here, as elsewhere, it is proper to recognize distinctions that exist in the nature of things, and under some circumstances to inhibit employments to some one class, while leaving them open to others. Some employments, for example, may be admissible for males, and improper for females; and regulations recognizing the impropriety, and forbidding women engaging in them, would be open to no reasonable objection. The same is true of young children, whose employment in mines and manufactories is commonly, and ought always to be, regulated. And some employments, in which integrity is of vital importance, it may be proper to treat as privileges merely, and to refuse the license to follow them to any who are not reputable." Cooley, Const. Lim. (6th ed.) 742.

In the unreported case of *Van Dann v. Uhl, Mayor of the City of Grand Rapids,* decided October 29, 1891 (no opinion being filed), the precise question in the present case was involved, and the writ was denied.

It is said in Black on Intoxicating Liquors (section 170):

"The rule obtains in a few of the states that if a person who desires a liquor license brings himself within the terms of the law, by complying with all the statutory preliminaries, and possessing the requisite moral and other qualifications, he is entitled, as a matter of law, to be licensed, and the license cannot be withheld from him. But in far the greater number of states the doctrine is now well settled that the court or board charged with the duty of issuing licenses is invested with a sound judicial discretion, to be exercised in view of all the facts and circumstances of each particular case, as to granting or refusing the license applied for." See, also, the authorities there cited: *In re Hoover,* 30 Fed. Rep. 51; *Sparrow's Petition,* 138 Penn. St. 116; *U. S. v. Ronan,* 33 Fed. Rep. 117; *Perkins v.*

*Ledbetter*, 68 Miss. 327; *Batters v. Dunning*, 49 Conn. 479; *Ailstock v. Page*, 77 Va. 386.

In this case the common council enacted an ordinance requiring application to keep a saloon to be made to it, and prescribing the conditions precedent to its consideration by the council. This places no limitation upon its discretion, but only prescribes a mode of procedure. I think the ordinance is clearly authorized by the charter, and that its plain intent is to confer upon the council the power to determine each individual application, so far as the location and suitableness of the place are concerned. The veto of the mayor was based entirely upon the unsuitableness of the place. Relator has been treated in the same way, and for the same reason, as was another who applied for a license in this same building. The place was in the rear part of the building, fronting upon Monroe street. A thin board partition separates the room where the saloon is to be kept from the front room. Application was made to keep a saloon in this building, designating it as "No. 48 Monroe Street," but was unanimously rejected by the council. The return alleges that this application is made in the interest of the former applicant. The mayor and the council are more familiar with the place and its surroundings, with its interior arrangements, with the purposes for which the entire building is to be used, and with all the circumstances of the case, than we can possibly be. When the mayor and council have in good faith exercised the discretion conferred upon them by the law, courts cannot review it. There is nothing in this case showing any abuse of discretion, or the arbitrary exercise of power. The action of the mayor, therefore, can only be reviewed by the common council.

The question in *People v. Furman*, 85 Mich. 110, was whether the general liquor law of 1887 repealed all prior acts of the Legislature inconsistent therewith, general as

well as local. The power of the Legislature to confer, by subsequent legislation, upon municipal corporations, the right to deal with the liquor traffic in a manner not provided for in the general law, is too clear to require argument. This right was conferred upon the city by a subsequent act.

Writ denied.

HOOKER, C. J., and MONTGOMERY, J., concurred with GRANT, J.

McGRATH, J. (dissenting). This is an application to compel the mayor and city clerk of Grand Rapids to issue a license to carry on a saloon at No. 80 Waterloo street, in a block located on the corner of Waterloo and Monroe streets. Relator presented his bond to the common council, and that body approved it, and recommended that the license be granted. The mayor vetoed the action of the common council, giving as his reason that an application had been before made, by one Johnson, for a license to keep a saloon at 48 Monroe street (the Monroe street front of the same building), which called forth a remonstrance, and the application was rejected; that—

"It seems to be the almost universal opinion that this is an unsuitable place for a saloon, and, aside from that, there are reasons which seem to justify its refusal. We are chosen to enforce the laws, and to see that no advantage is taken of us, where the laws can be evaded. In this case there is only a temporary board partition separating the room on Monroe street from the room where the saloon is to be kept, and immediately upon the license being received this partition can be taken down, and the saloon opened up on Monroe street; and there is no power possessed by the city, or its officers, to prevent running it at the place where they have refused, unanimously, to have it located. We should make it sure this would not happen.

"Again, I am convinced that this application in the interest, if not for the use, entirely, of Mr. Johnson, and Mr. Johnson himself states to me that he expects to open a

restaurant on the second floor, in case the billiard tables are moved out, as they may be, and to fit up sleeping rooms on the third floor, with an inside stairway from the saloon to this restaurant.   We would be putting it beyond the power of the officers to compel compliance with the laws."

Section 10, title 3, of the charter of Grand Rapids provides that the common council—

"Shall have power, within said city, to enact, make, continue, establish, modify, amend, and repeal such ordinances, by-laws, and regulations as they deem desirable, within said city, for the following purposes:      *      *      * To license and regulate the keepers of hotels, taverns, and other public houses, grocers, and keepers of ordinaries, and victualing and other houses or places for furnishing meals or food; to restrain, license, and regulate saloons, and to regulate and prescribe the location thereof."

The ordinance provides that—

"No person shall engage in the business of saloon keeping, in any house or place within the limits of this city, without first having obtained a license for that purpose from the common council."

Every person desiring to keep a saloon is required by this ordinance to make an application in writing to the common council, stating the number or location of the saloon, accompanied with a recommendation, signed by at least 12 reputable and respectable citizens of the city, certifying that the applicant is of good reputation, fame, moral character, and an orderly person.   No ordinance has been enacted fixing any districts, prescribing the location of saloons, or how they shall be separated from other apartments, or how the building shall be otherwise occupied.

It will not be contended that the charter power to license includes the power to prohibit either hotels, taverns, public houses, groceries, or saloons.   The right to sell liquor, under certain restrictions and conditions, is made lawful by statute, and the statute expressly provides by what

method counties may exercise the prohibitory power. The power to license is conferred as a mere incident of the power to regulate. When the liquor business is carried on within the restrictions established by the Legislature, and such additional restrictions as may be lawfully imposed by local authority, its rights should be respected and protected by courts as carefully, and to the same extent, as those of any other business. *People v. Scranton,* 61 Mich. 244; *Amperse v. City of Kalamazoo,* 59 Id. 78. The power to regulate assumes the existence of the traffic. Suppression is not regulation, but prohibition. The words "regulate" and "prohibit" are not synonymous. *People v. Gadway,* 61 Mich. 285; *In re Hauck,* 70 Id. 396.

In *Potter v. Village of Homer,* 59 Mich. 8, 13, Chief Justice CAMPBELL says:

"The Legislature, and not the common council, has the right, and has exercised the duty, of determining on what terms liquors may be sold. * * * It was not designed by the law that the lawfulness or unlawfulness of the traffic should be determined by a common council, or that the power to do business should depend on their pleasure. The statute itself has fixed the conditions, and nothing is left to the council, except to pass upon the sufficiency of the sureties. * * * In this they have the same discretion, and no more, that is possessed by other persons called on to approve sureties. * * * It is tyrannical, as well as unlawful, to hinder any one who is ready to furnish security from conducting his lawful business."

In *Re Frazee,* 63 Mich. 396, 406, it was held that whatever regulations are made by a municipality must operate uniformly under the same conditions.

"All by-laws," says Chief Justice CAMPBELL, "made to regulate them, must fix the conditions expressly and intelligibly, and not leave them to the caprice of any one. * * * When men in authority have arbitrary power there can be no liberty."

The ordinance in that case was held to be unreasonable—

" Because it suppresses what is in general perfectly lawful, and because it leaves the power of permitting or restraining processions, and their courses, to an unregulated official discretion, when the whole matter, if regulated at all, must be by permanent legal provisions, operating generally and impartially."

The act of 1887 undertook to authorize the rejection of the bond if the principal was known to the board, to which the bond was presented for approval, to be a person whose character and habits would render him an unfit person to conduct the business. In *Robison v. Miner*, 68 Mich. 549, 555, this provision was held void. Mr. Justice CAMPBELL, referring to the power sought to be vested in the board, says:

" If no standard is laid down, there may be as many scales of fitness and unfitness as there are boards. We have already had occasion, under the old law, to discover that boards desirous of preventing liquor selling are ingenious in finding fault with bondsmen. There are very many excellent people who regard every seller of liquor as a bad man, unfit for social privileges, and others who hold peculiar views on other topics, which would render them harsh censors. If the statute had fixed the rule, there would be means of protecting parties against caprice and condemnation unheard. But when the same persons are to be judges of the proper causes of rejection, as well as of the fitness of persons under such causes, the law subjects every one to the mere will of his neighbors, and gives him no rights whatever. No man's rights can be submitted, under a constitutional government, to the discretion of anybody."

See, also, *Kuhn v. Common Council*, 70 Mich. 534, 538.

In *Baltimore v. Radecke*, 49 Md. 217, 230, referring to an ordinance respecting the use of steam engines in the city of Baltimore, the court say:

" It does not profess to prescribe regulations for their construction, location, or use, nor require such precautions and safeguards to be provided by those who own and use them as are best calculated to render them less dangerous to life and property, nor does it restrain their use in box factories, and other similar establishments, within

certain defined limits, nor in any other way attempt to promote their safety and security without destroying their usefulness. But it commits to the unrestrained will of a single public officer the power to notify every person who now employs a steam engine in the prosecution of any business in the city of Baltimore to cease to do so, and, by providing compulsory fines for every day's disobedience of such notice and order of removal, renders his power over the use of steam in that city practically absolute, so that he may prohibit its use altogether. But if he should not choose to do this, but only to act in particular cases, there is nothing in the ordinance to guide or control his action. It lays down no rules by which its impartial execution can be secured, or partiality and oppression prevented. * * * When we remember that this action or non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism, and other improper influences and motives, easy of concealment, and difficult to be detected and exposed, it becomes unnecessary to suggest or to comment upon the injustice capable of being wrought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration. In fact, an ordinance which clothes a single individual with such power hardly falls within the domain of law, and we are constrained to pronounce it inoperative and void."

In *Yick Wo v. Hopkins*, 118 U. S. 356, an ordinance of the county and city of San Francisco made it unlawful for any person to carry on a laundry business within the corporate limits without first obtaining the consent of the board of supervisors, unless the laundry was located in a brick or stone building. It appeared that there were about 320 laundries in San Francisco; that 310 of them were in wooden buildings; that 240 of them were owned and conducted by Chinamen; that 200 of said Chinamen had applied to the board of supervisors for permission to do business; and that all of said applications were denied, while all the applications of those of other nationalities were granted, except one. The court held that the ordinance was invalid because it undertook to confer

arbitary power on the supervisors to deprive a person of the right to carry on his business. Mr. Justice Matthews, speaking for the court, says:

"If an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of *mandamus* to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their assent without reason, and without responsibility. The power given to them is not confined to their discretion, in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint."

In *Tugman v. Chicago*, 78 Ill. 405, it was held that an ordinance which prevents one citizen from engaging in a particular business in a certain locality, under a penalty, while another is permitted to engage in the same business in the same locality, is unreasonable and void, and that it makes no difference that the persons who are allowed to continue were already engaged in the business when the ordinance was adopted, for, if the ordinance prohibits one from carrying on the business, that prohibition should extend to all, regardless of the time the business may have been commenced.

The reasons given by the mayor for his veto in the present case illustrate the necessity for some uniform regulations fixing the rights of applicants, and the conditions under which licenses may be granted. The mayor *is convinced* that the application is in the interest, if not for the use, of Johnson. This is a mere supposition, unwarranted by any fact that appears either in relator's application to the council, or in the return here made. It is a mere notion of his own. The fact that a restaurant

"may be" opened on the second floor "if the billiard tables are removed, as they may be," or that sleeping rooms are to be located on the third floor, or that the board partition divides the lower floor into two apartments, or that stairs lead from this floor to the next, are not unusual conditions. In a number of the cases which have come before this Court, saloons are carried on in connection with restaurants, cigar stores, billiard rooms, and lodging apartments, and no law exists prohibiting such connection. In other cases, saloons are connected with living apartments. In others, side doors connect with hallways, and back doors with alleys. These are matters which are susceptible of definite rules, if the power exists to impose conditions respecting them. In the absence of rules applicable to all, there is no protection against individual persecution, and the exercise of arbitrary power or caprice, and the success of any application may depend upon the measure of the applicant's influence, or upon the influence exercised by the proprietor of the establishment next door, which has already been licensed.

The power to license or regulate the business, or to prescribe the locality in which it shall be carried on, is conferred with the intention that it shall be exercised by the body to whom that power is delegated, and in the mode prescribed. Black, Intox. Liq. § 228; Cooley, Const. Lim. (6th ed.) pp. 248, 249. The very grant of power, in the present case, describes the mode of its exercise. It contemplates definite, impartial, and permanent rules, operating uniformly, and negatives the idea of an arbitrary exercise of the power in each case, as it may arise. If the position taken by respondents is correct, the council may refuse a license to A., and grant one to B., or it may refuse to grant one to A., at No. 80 Waterloo street, and grant one to B., at No. 82 Waterloo street. Indeed, the petition in the present case sets up, and it is not denied, that within

less than 11 feet of the place named there is a saloon in operation, and within the same block there are three saloons.    The power conferred by the charter can only be exercised by the adoption of a general ordinance, prescribing a general rule by which licenses may be granted, and all persons coming within the requirements of such ordinance, and complying with its terms, are entitled to receive a license.    Black, Intox. Liq. § 228.    The matter must not be left to the caprice of any one, but, if regulated at all, must be by permanent legal provisions, operating generally and impartially, and reasons given for the refusal of a license must have their basis in, and be supported by, such provisions.    See *State v. Mahner,* 43 La. Ann. 496; *State v. Dubarry,* 11 South. Rep. 718; *City of Jacksonville v. Ledwith,* 26 Fla. 163; *Ex parte Theisen,* 11 South. Rep. 901.

In *Sparrow's Petition,* 138 Penn. St. 116, and in *Raudenbusch's Petition,* 120 Id. 328 the general law provided that the court of quarter sessions should hear petitions, in addition to that of the applicant, in favor of, and remonstrances against, the application for such license, and in all cases should refuse the same whenever, in the opinion of the said court, having due regard to the number and character of the petitioners for and against such application, such license was not necessary for the accommodation of the public, and entertainment of strangers or travelers, or that the applicant was not a fit person to whom such license should be granted.    In *U. S. v. Ronan,* 33 Fed. Rep. 117, and in *Re Hoover,* 30 Fed. Rep. 51, the code of Georgia expressly empowered the commissioners "to grant or refuse such application" for a license.    In *Ailstock v. Page,* 77 Va. 386, by express statutory provisions, the county courts were vested with discretionary powers, and the applicant was allowed an appeal.    In *Batters v. Dunning,* 49 Conn. 479, the act authorized the

county commissioners to license suitable persons to sell liquors in suitable places, and the court held that the statute had characterized, by a general qualifying word, the persons to be licensed, and the places of business; that the word was not defined by law, so that its application could be determined, except by the judgment of the commissioners. There is no doubt as to the power conferred in any of these cases.

The case of *Van Dann v. Uhl, Mayor of the city of Grand Rapids,* is cited by the majority, but that case is not reported, and we have been unable to agree as to just why the order to show cause was refused in that case, and there is no *data* at hand from which to settle the question. *Karreman v. Mayor of Grand Rapids,* determined July 9, 1889, but not reported (no opinion being filed), involved the same question here presented, and after a full hearing a *mandamus* was granted.

The section of the charter of Grand Rapids, referred to by Mr. Justice GRANT, prohibiting persons from engaging in the business without having first obtained a license, is as follows:

" SEC. 21. No person shall engage in or exercise the business or occupation of hotel or tavern keeper, innholder, common victuler, or saloon keeper, within the limits of said city, until he is first licensed as such by the common council, under such penalty as the common council may by ordinance prescribe; and all persons who shall keep a bar, or who shall sell beverages by the cup or glass, shall be deemed saloon keepers, within the meaning of this act, and be required to take license as such: *Provided,* that nothing in this act shall be construed as licensing the sale of intoxicating liquors as a beverage."

The power of the council in the premises is derived from section 10, and not from section 21. The question here is not so much what power the Legislature has over the liquor traffic, or what power may be delegated to

96 MICH.—14.

municipalities, but rather what is the nature of the power granted in this particular instance? Does the grant prescribe the manner of its exercise? Is the power granted power to legislate on the subject, or is it a discretionary power, in the absence of ordinance, regulation, rule, or order? Does the grant of power to license under fixed rules, orders, regulations, or ordinances convey the right to refuse arbitrarily a license in a case where all the conditions of existing ordinances have been complied with? I think not, and the writ should issue.

LONG, J. (*dissenting*). I am unable to agree fully with my brethren in this case. There can be no doubt that under our Constitution the Legislature has power to confer authority upon the common council of a city to regulate the business of selling liquors, or to prohibit the business altogether. The power over the liquor traffic is vested by the Constitution in the Legislature, to deal with it as it deems expedient, since the constitutional amendment of 1876; and the Legislature may now delegate the power of control to the legislative body of the municipality under the provisions of section 38, article 4, of the Constitution, which provides that "the Legislature may confer upon organized townships, incorporated cities and villages, and upon the board of supervisors of the several counties, such powers of a local legislative and administrative character as they may deem proper." *Friesner v. Common Council*, 91 Mich. 504, 508.

The Legislature, by the charter of Grand Rapids, conferred upon the common council the power "to enact * * * such ordinances, by-laws, and regulations as they deem desirable * * * to restrain, license, and regulate saloons, and to regulate and prescribe the location thereof." Under this provision of the charter the common council passed the ordinance in question, which reads:

"No person shall engage in the business of saloon keeping, in any house or place within the limits of this city, without first having obtained a license for that purpose from the common council." The ordinance also provides that every person desiring to keep a saloon shall make an application in writing to the common council, stating the number or location of the saloon, accompanied with a recommendation, signed by at least 12 reputable and respectable citizens of the city, certifying that the applicant is of good reputation, fame, moral character, and an orderly person.

There can be no question, it seems to me, that the ordinance is within the power conferred by the charter. Acting under this ordinance, the relator presented his application in writing to the common council. The application was accompanied with a recommendation, signed by 12 or more citizens of the city, certifying that the applicant was a person of good reputation, fame, and moral character, and an orderly person. The common council acted upon this petition, and by a majority vote decided that the license should issue. The mayor, claiming the right to exercise the veto power under the provisions of the charter, sent to the council his reasons why the license should not be granted. No further action has been taken, and the writ of *mandamus* is asked to compel the mayor and clerk to issue the license granted by the council. The reasons given by the mayor for his veto of the action taken by the council are not that the application is not accompanied with a recommendation, signed by 12 reputable and respectable citizens of the city of Grand Rapids, certifying that the applicant is of good reputation, fame, moral character, and an orderly person; neither is it based upon the fact that the 12 persons making certificate are not reputable and respectable, or that the applicant is not a person of good reputation, fame, moral character,

and an orderly person; but his objections were based entirely upon the unsuitableness of the place where the saloon was proposed to be kept. The place was in the rear part of a building fronting on Monroe street, and a thin board partition separated the room from the front room, which faced the street.

It is evident that the mayor's veto was the exercise of arbitrary power, and not warranted by the ordinance. Under the ordinance no person could keep a saloon without obtaining a license from the council, but the ordinance also provided what showing should be made to the council to obtain it. This showing was made, and the council granted the license. The mayor then stepped in, and, in no manner claiming but that the requirements of the ordinance had been fully complied with, sought to prevent the issue of the license- upon some other ground, which the ordinance had not provided. This ordinance was a law of the city, and every person complying with its provisions had a right to have a license to keep a saloon. It could not be issued to one person, and denied to another. If the council desired to have other restrictions placed upon the business of keeping saloons, it should have provided such restrictions, or left out all mention of them.

The Legislature undoubtedly has the right to prohibit altogether, and may confer this power upon municipalities, and, if it may prohibit, it may impose such conditions upon the traffic as it may deem wise. It is not for the courts to determine the expediency of such legislation, or, as said by Mr. Cooley in his work on Constitutional Limitations, "to run a race of right, reason, and expediency with the legislative branch of the state government." Cooley, Const. Lim. 597. See, also, *Robison v. Haug*, 71 Mich. 42. It is said in *Ex parte Christensen*, 85 Cal. 208: "If the governing power can prohibit a thing altogether, it can impose such conditions upon its existence as it

pleases." But the ordinance under consideration does not prohibit. It purports that the council shall grant licenses upon certain conditions, which are specifically set forth in the ordinance. The council has acted upon the application, and found that the conditions prescribed have been complied with. The mayor, by his veto, now sets up other conditions, not required by the ordinance. It may be true that the council would have had the right, under the charter, to impose the conditions by the ordinance which the mayor now prescribes; but it has not been done, and the mayor has no right now to prescribe them, or to insist upon conditions not so prescribed.

The writ of *mandamus* should issue as prayed.