## STATE EX REL. NOBLE v. THE CITY COUNCIL OF THE CITY OF CHEYENNE.

Intoxicating Liquors — Licenses — Municipal Corporations.

1. The clear intent and meaning of the provisions of the third subdivision of Section 161, Revised Statutes, is that, as to all the occupations and kinds of business mentioned in the subdivision, the city of Cheyenne may enact ordinances not only to tax, but to regulate; and the power to license is included in the power to tax and regulate.

2. Under our laws, if a municipal license for the sale of liquors is lawfully provided for, it is in addition to the county license. Where both are provided for, one must possess both to lawfully sell liquors within the corporate boundaries.

27

3. The Legislature may regulate and restrain the sale of intoxicants.

4. Such power may be delegated to municipal corporations, in the absence of constitutional restrictions, to be operative within their respective limits; and this is so, notwithstanding that the subject has already been provided for by the general laws of the State.

5. The Legislature may confer a lawful discretion upon boards and officers appointed to grant liquor licenses.

6. Where a municipality has legislative authority for such purpose, it may restrict the localities within which intoxicating liquors may be sold, and the character of persons to whom licenses for the sale thereof shall be issued, may be prescribed.

7. It is a fundamental principle that there is no inherent right in a citizen or any one, to sell intoxicating liquors by retail, and that there is not a vested right in any person to have a liquor license.

8. Under the authority granted by its charter, to the city of Cheyenne to tax and regulate, the city possesses the power to license saloons and liquor sellers; to regulate the same by ordinance by prescribing the locality or localities in which such business shall be permitted, and to provide by ordinance, that the consent of the council shall be obtained before the issuance of a license for the sale of intoxicating liquors within certain limits or localities.

9. Such discretion should be reasonably and soundly exercised, and should not be enforced merely as a matter of caprice, but the action of the council in any case should appear to be based on reasons.

10. The charter authorizing a city to enact ordinances regulating the matter of granting licenses for the selling at retail, of intoxicating liquors; in pursuance of that authority, the ordinances may vest a discretionary power in the council, the same to be reasonably exercised, as to the place or places, where such sale, within the city, shall be permitted or denied, and may prescribe the locality or districts within which said sales may be, and without which may not be licensed.

11. An ordinance of the city of Cheyenne provided that no license for the sale of intoxicating liquors should be issued without special permission of the council for the sale of such liquors within a certain described district within the city. *Held*, that the ordinance was valid.

12. The council of the city of Cheyenne having refused a license to relator for the sale of intoxicating liquors within the district described in such ordinance, for the reason that the place for which the license was desired had become a notorious resort for lewd, disreputable, and vicious people ; was conducted in a disorderly manner, and so that constant surveillance on the part of the police was required in that part of the city, in order to prevent crime and violations of city ordinances, and in consequence thereof the locality acquired such an evil reputation that it was deemed best by the council that no saloon be maintained in that particular locality. *Held*, that the council had authority to refuse a license to relator notwithstanding that he should give a sufficient bond as required by the ordinances of all licensees.

[Decided April 19, 1898.]

RESERVED questions from the District Court for Laramie County.   Hon. DAVID H. CRAIG, Judge of the Third District, presiding.

Mandamus proceeding brought upon the relation of Philip Noble to compel the city council of the city of Cheyenne to issue to relator a license to sell liquors at a designated place in said city.   The facts are stated in the opinion.

*W. R. Stoll*, for relator.

The authority granted the city " to levy and collect taxes on dram shops, saloons, and liquor sellers," is not an authority to regulate.   The only authority which has been granted to the city to restrain, prohibit, and suppress the liquor business, is that which is granted to restrain, prohibit, and suppress " *tippling shops.*"   The mere taking out of a license does not constitute a retail liquor dealer the keeper of a tippling house.   A tippling house is a house where tippling is carried on in violation of law. (2 Bouv. L. Dict., 732; Black on Int. Liq., Sec. 20; Emporia v. Volmer, 12 Kan., 622; 26 Ency. L., 18 and 19.)

In the absence of a statute expressly or by implication giving to a particular body, board, or person a discretion in the matter of issuing or rejecting licenses, the appli-

cant is entitled to his license if he brings himself within the conditions prescribed by the statute. Miller v. Wade, 58 Ind., 91; Zanone v. Mound City, 11 Ill. App., 334; State v. Justices, 15 Ga., 408; Mc Leod v. Scott, 21 Or., 94; Amperse v. Common Council, 59 Mich., 78.

In Sec. 170 of Black on Int. Liq., the statement is made to the effect that the rule obtains in a few States, that if a person who desires a liquor license brings himself within the limits of the law by complying with all the statutory preliminaries and possessing all of the qualifications, he is entitled as a matter of law to a license, and the license can not be withheld from him; but that in far the greater number of States, the doctrine is well settled that the court or board charged with the duty of issuing licenses is invested with a sound judicial discretion to be exercised in view of all the facts and circumstances in each particular case, as to granting or refusing the license applied for. . If by this Black means that a great number of States have passed laws expressly or by necessary implication giving a discretion in the matter of issuing licenses to a court or board charged with the duty of issuing licenses, his statement may be correct; but his statement is absolutely wrong if he means that, irrespective of any provision of the Legislature upon the subject embracing the matter of the exercise of discretion in the issuing of licenses, such discretion nevertheless exists. And the cases which he cites as sustaining his proposition absolutely do not sustain it at all, but, on the contrary, repudiate such an idea.

Counsel reviewed the citations in Black to show that in each case there had existed a discretion authorized by the Legislature: and cited the following to support the proposition maintained by counsel, viz: that a license can not be withheld where an applicant brings himself within statutory requirements, unless a clear discretion has been granted to some board, court, or body, to control the the matter. (Jones v. Commr's, 106 N. C., 436; Crowley v. Christensen, 137 U. S., 86; In re Christen-

sen, 43 Fed., 243; Comm'rs. v. Comm'rs., 107 N. C., 335; State v. Newcomb, id., 900: Hillsboro v. Smith, 110 N. C., 417; People v. Board, 16 N. Y. S., 798; In re Hoover, 30 Fed., 51; U. S. v. Ronan, 33 Fed., 117; In re Pollard (Pa.), 17 Atl., 1087; In re Johnson (Pa.), 26 id., 1066; In re Brew. Co., 17 id., 1090; Sherlock v. Stewart, 96 Mich., 193.)

The power to *tax* property is conferred by the 1st paragraph of Sec. 161; and plainly the sense in which the power to tax is used in the 3d paragraph includes the power to license.   The power to levy a tax, as conferred in the 3d paragraph of Sec. 161, must be understood to include the power to license, especially in view of the legislation of our State upon this subject. (Board v. County, 50 Ill., 69; Black Int. Liq., Secs. 55 and 108, 109; State v. Council, 33 N. J. L., 280; 1 Dill. Mun. Corp., Secs. 357–361; 13 Ency. L., 532–534.)

It is elementary that a municipal corporation can exercise only such powers as are granted to it in *express words*, or those which are *necessarily and fairly implied as incident* to the powers *expressly granted*, or those *essential* to the declared objects and purposes of the corporation.   It is a settled canon of construction, that only such powers and rights can be exercised as are clearly comprehended within the words of the charter or are derived therefrom by necessary implication; and that whenever there is any ambiguity or doubt as to the powers so conferred, such powers must be resolved against the city and in favor of the public.   1 Dill. Mun. Corp., Secs. 89, 90; 15 Ency. of Law, pp. 1039–1042.

In general in regard to the general welfare clauses of city charters, it is a general rule that the right conferred to enact ordinances by these clauses is merely such a right as is necessary to carry out the powers already granted, or to carry out such powers as are necessarily implied or as are incident or necessary to the existence of the corporation.   In other words, the city is authorized, under such clauses, to enact such

ordinances as may be necessary to enforce incidentally the powers granted, or to enact such ordinances as are necessary to the full and complete carrying on of the purposes of the city government, but not to control or limit powers expressly granted. (15 Ency. of Law, pp. 1187–1192; 13 id., pp. 529–531; 1 Dill. Mun. Corp., Secs. 394–407, and cases cited in notes; 1 id., Secs. 315, 316; 1 id., Sec. 316, and cases cited in notes; city of Chariton v. Barber (Ia.), 6 N. W., 528; State v. Ferguson, 33 N. H., 424.)

Municipal ordinances must be within the power conferred, and must not be repugnant to the laws of the State. (People v. Cratty, 93 Ill., 186; 1 Dill. Mun. Corp., Secs. 20, 307–309, 315–317; 17 Ency. L., 235–237; Hull v. Quincy, 9 Ill., App., 127; City v. McHenry; 50 Ill., 28.) The municipality can not delegate its powers, and hence it can not delegate to any officer the authority to issue licenses. (1 Dill. Mun. Corp., Sec. 96; 15 Ency. L., 1042; 17 id., 237; Black Int. Liq., Secs. 155, 228; 72 Ill., 462; 19 Minn., 389; 50 Ill., 28; 11 So. (La.), 36.)

The license ordinance of February 16, 1897, was void if it attempted to confer a discretion upon the council. But it did not prescribe the method of obtaining permission of the council; hence such method is determined by the other ordinances, which require the issuing of a license upon certain conditions, all of which were complied with by the relator.

In the absence of a provision in the charter giving a city the power to designate the portions of the city within which liquors may be sold, and further, giving to the city the power to determine the number of licenses that shall be issued within such district, the city has no authority to give a license to one in a particular district, and to refuse it to another in the same district, other things being equal. Levy, Ex p. 43 Ark., 42 at 61; Tugman v. City of Chicago, 78 Ill., 405; Mayor v. Thorne, 7 Paige, 261.)

To be valid, an ordinance must be reasonable, not oppressive, nor contravene any common right, and must be impartial, fair, and general, and consistent with public legislative policy. (1 Dill., Secs. 319–329; Moore v. St. Paul, 51 N. W., 219.) Whether reasonable or not is a question for the court. (State v. Mayor, 37 N. J. L., 348.)

*E. W. Mann*, for respondent.

The relator must show a clear legal right to the writ of mandamus before the same will be granted. (14 Ency. L., 94; State v. Supervisors, 2 Pin., 552; People v. Cratty, 93 Ill., 180; People v. R. R. Co., 55 id., 110.) Mandamus is issued or withheld in the discretion of the court, and, in issuing it, the court will be governed by what seems necessary and proper for the purpose of justice. (14 Ency. L., 97; Swift v. People, 63 Ill. App., 453; 2 Beach Pub. Corp., Secs. 1548, 1574–1579; 2 Dill. Mun. Corp., Sec. 864, n. 2.) While some of the cases cited in Black on Intoxicating Liquors respecting the discretion of license officers, are based upon the terms of statutes, the following are not. (77 Va., 386; 11 Gratt., 655; 13 W. Va., 358; 5 Iredell, 315; 89 N. C., 171; 2 Duval, 546; 34 Ark., 394; 43 id., 42; 45 Ind., 501; 39 Mo., 521; 7 Utah, 143.) These cases support the contention of respondent that the city may exercise a discretion in the granting of liquor licenses, particularly so, as the city has the undoubted charter power to regulate the business of selling liquors. The following also support the same contention. (Perkins v. Ledbetter, 68 Miss., 327; Swift v. People, 63 Ill. App., 453; Sherlock v. Stuart, 96 Mich., 193; 119 Ind., 494; 110 N. C., 417; 75 Hun, 224; 4 N. Y. Misc., 1; id., 10; id., 247; id., 547.) Courts will not interfere by mandamus with the action of a board having discretionary authority in matter of liquor licenses. (Rev. Stat., Sec. 3074; 14 Ency. L., 108–111; 11 id., 649; State v. Crites, 48 O. St., 460; State v. County, 12 Neb., 54; 15 id., 262; 78 Ga., 120;

Stanley v. Monnet, 9 Pac., 755.)   The city had authority
to enact the ordinances, not only under the general wel-
fare clause, but also under the clause granting power to
regulate the sale of liquors.   (Portland v. Schmidt, 13
Or., 17; Piqua v. Zimerlin, 35 O. St., 507; State v. Free-
man, 38 N. H., 426; 11 Ency. L., 617; Black Int. Liq.,
Sec. 234.)   As to the effect of the general welfare clause,
see 1 Beach Pub. Corp., Secs. 580–583; 1 Dill. Mun.
Corp., Secs. 363 and 400; 11 Ency. L., 614.)

It is claimed in the brief of the relator that the respond-
ent has been guilty of abuse of discretion, if it has any
discretion in the matter of licensing saloons, for the rea-
son that while it has refused a license to the relator it has
granted licenses to two other parties, for the sale of liq-
uors in the same part of the town in which the relator
desires to engage in business.

It is claimed on behalf of the respondent that there is
no abuse of discretion in this matter for the reason that it
clearly appears from the agreed statement of facts, and
from the transcript of the proceedings of the respondent,
that a saloon had been formerly conducted at the place
where the relator desires to engage in business, which
had become a source of annoyance and danger to the city;
that it was desired to close said saloon; that a resolution
was passed providing that no license should issue for the
sale of liquor in a considerable portion of the town and
including the portion where the said saloon was situated;
that the party who last kept a saloon at that particular
place desired to continue in business there, and made an
application for a license to be issued to him, but after-
ward on ascertaining the views of the individual members
of the council in regard to his application, he withdrew it,
and that afterward and before the application of the rela-
tor for a license was made, the respondent refused the
applications of two other parties who desired to engage in
business either in the place where the said saloon was last
carried on, or in the one which it formerly occupied.

It is also recited that the respondent will not issue a

license to the relator or any other person to conduct a saloon in the locality mentioned in his application for a license, unless compelled to do so by some court having jurisdiction in the premises.

It is evident therefore that the discrimination in this case is not made against the relator as an individual, but it is made against the place in which he desires to carry on business, and it is submitted that this is a proper fact to take into consideration in determining whether or not a peremptory writ of mandamus should be issued as applied for by the relator.

Potter, Chief Justice.

On the 5th day of October, 1897, the relator applied to the city council of the city of Cheyenne for a license permitting him to open and conduct a retail liquor establishment for the selling of spirituous, vinous, fermented, and intoxicating liquors in a building known as 606 and 608 West Eighteenth Street in said city.   In his application it was stated that the relator had his United States license for 1897, and also his county license running from May, 1897, to May, 1898.   At the same time he submitted a bond in the amount prescribed by the city ordinances. The council at a regular session of that body refused to grant the application.   The records of the council showing in brief that the application was referred to the police committee, who reported adversely thereon; that the report was adopted by the council, and the license fee which accompanied the application was ordered returned to the applicant.

The relator thereupon obtained an alternative writ of mandamus from the district court.   After the disposition of some preliminary matters of pleading, an answer and reply were filed, and the whole case submitted upon an agreed statement of facts, embodying therein the matters above stated with other facts upon which it was agreed the cause might be determined.   The district court upon its own motion, thereupon reserved certain questions arising

therein deemed to be important and difficult, for the decision of this court.

The chief point of contention is the right of respondent to refuse to grant the license. The questions are fifteen in number, and present some matters which we do not conceive it necessary to decide in this cause.

The answer alleged that the place at which the relator desired to open and conduct a saloon under the license applied for had been for a long time known as the "Chicago Saloon;" and it had become a notorious resort for lewd, disreputable, and vicious people; was conducted in a disorderly manner, and so that constant surveillance on the part of the police force was required in that part of the city where the saloon was conducted, in order either to prevent the commission of crimes or violations of the city ordinances, or to arrest parties guilty of committing crimes or of such violations; and in consequence thereof, the locality in which said saloon was conducted acquired a reputation of such an evil character that it was deemed best by the council that no saloon should be maintained or kept in that particular locality. That, in pursuance of that determination, the ordinance of February 16, 1897, which will be adverted to in connection with other ordinances of the city, was adopted. These particular facts, although not denied by the reply are not brought into the agreed statement of facts. Instead thereof the entire proceedings of the council relating to the matter are made a part of the statement together with the ordinances. From them it appears that on November 24, 1896, at a meeting of the council "the mayor called the attention of the council to the recent developments in connection with a certain saloon in the western portion of the city, known as 'Chicago Saloon.' The mayor was of the opinion that such resort was one of a menacing nature to the city, and might sooner or later create trouble of a serious and expensive nature to the city. He further stated that in his opinion no license should be granted to such places, and if it was in his power, he would refuse to issue same,

but the matter was in the power of the council, and he therefore could do nothing, but suggested that the council take some action.''   At that meeting the council adopted a resolution that no license should be issued to any person for the sale of intoxicating liquors at any place in the city north of the center line of Seventeenth Street, or west of the center line of Thomes Street.

On February 2, 1897, one Mollberg, who had theretofore conducted the saloon referred to, applied for a continuation of his license.   The matter was held over until February 16, 1897, when at his request he was allowed to withdraw his application.   An ordinance was, on that date, adopted regulating the subject, for the particular locality in question, in connection with other ordinances already existing.   At that meeting also a license was ordered issued to one applicant for 620 West Eighteenth Street, and on March 2, 1897, a license was ordered issued to another for 333 Bent Street, and licenses were refused to two others, respectively, one of them desiring a license for the place specified in relator's application, and the other for a place directly opposite and in close proximity thereto.   The two licenses granted were for places located within the limits mentioned in the aforesaid resolution, and in the ordinance of February 16.   The places for which the said licenses were refused were also within said limits.

The ordinances of the city, governing the subject of liquor licenses with the exception of the one of February, 1897, were originally adopted prior to the taking effect of the present city charter, and when the municipal affairs were controlled by a board of trustees one of whom was chosen as president.   Such ordinances were continued in force by the new charter of 1877, until repealed or amended.   (Sec. 174, Cheyenne City Charter, page 115, Rev. Stat.)

Under the present charter, the corporate powers are exercised by a mayor and council consisting of nine members, and the new corporation became the legal successor of

the city which existed under the former charter.    (Sec. 174 supra.)

The municipal ordinances conceded to affect the matter of liquor licenses are as follows: "The president or board of trustees are hereby authorized to grant licenses for the sale of spirituous, vinous, fermented, and intoxicating liquors, to any person who shall apply therefor, upon such person executing to the city of Cheyenne a bond, with at least two sureties to be approved by the president, in the penal sum of three hundred dollars, conditioned that the party so licensed shall faithfully observe and keep all ordinances heretofore passed or to be passed during the period of such license. On compliance with the foregoing requirements, a license shall be issued to the applicant, which shall authorize the person or persons therein named to sell, barter, give away, and deliver wines and liquors, whether vinous, ardent, or fermented, in quantities less than one gallon in the place designated in the application: Provided that no license shall be granted or issued for a less sum than one hundred dollars a year, or twenty-five dollars for each quarter of a year, and all licenses shall be issued quarterly, payable in advance." (Art. 6, Sec. 1, Chap. 31, City Ordinances.)

Section 4 of the same article prohibits the sale of any liquors in the city without a license, except by druggists for medicinal, mechanical, or sacramental purposes, and penalties are imposed for violation thereof. The above are found in a general ordinance concerning licenses adopted in 1870, which covers in separate chapters a number of occupations. The first chapter thereof regulates the issuance of licenses generally; and, in substance, it is provided thereby that all licenses which may be issued under any ordinance of the city shall be subject to the ordinances and regulations in force at the time of the issuing thereof; that all licenses shall be issued and signed by the clerk, under the city seal, pursuant to the order of the president or board of trustees, upon the payment to the marshal of the sum assessed therefor, together

with the appropriate fees; that no license shall be assignable or transferable without permission of the president or board of trustees; and that, in all cases where it is not otherwise expressly provided, the president or board of trustees shall have power to hear applications for, and to order the issuing of licenses upon, the terms specified by the city ordinances.    Provision is also made for cancellation or revocation of a license for cause.    In 1877, but prior to the existence of the present charter another ordinance was adopted entitled " An ordinance concerning licenses and good order."    Section one of that ordinance requires that all licenses for the sale of intoxicating liquors shall contain a stipulation against a violation of any of the city ordinances relating to the sale of liquors, and for a cancellation in case of such violation after hearing, and that if so cancelled no other license shall issue to the same person or his agent for six months thereafter unless ordered by the board.    Section 2, as amended in 1891, increases the amount to be paid for liquor licenses to $30 per quarter; and Section 3, requires a bond in the sum of $500, with certain stated conditions.    Section 6, as amended in 1885, authorizes a cancellation of license for certain stated causes.    Sections 2 and 6, as amended, were adopted during the life of the present charter.

On February 16, 1897, the following ordinance was duly passed and approved:    " That hereafter no license for the sale of spirituous, vinous, fermented, or intoxicating liquors of any kind shall be issued by any officer of the city of Cheyenne, without special permission of the council for the sale of such liquors, within that portion of the city of Cheyenne, bounded on the south by Seventeenth Street, and on the east by Thomes Street."

The place named by relator in his application is located in the portion of the city covered by that ordinance.

Persons engaged in selling liquors are also required by general law to obtain a county license therefor. (Title, 26 Rev. Stat.)    If the business is licensed to be carried

on in an incorporated town, city, or village, the license money is collected by the collecting officer of the municipality, although the license is issued by the county officers. (Sec. 1438, Rev. Stat., as amended by Chap. 44, Laws 1888.) And such license money is expressly authorized to be collected for the city in addition to the licenses issued by the city. (Id.) It is made a penal offense to sell liquors without a license. (Sec. 1442, Rev. Stat., as amended by Chap. 23, L. 1890, 1891; Sec. 1455, Rev. Stat.)

On behalf of the relator it is contended that, in the absence of a statute which either expressly, or by implication, gives to the licensing authorities a discretion in the matter of issuing licenses, an applicant who complies with all the prescribed conditions is entitled to his license; that no discretion is vested in the city council; and that the powers with which the council is clothed must be exercised by ordinance. It is then argued that the relator has complied with the law and ordinances in his application, and is entitled as a matter of law to the license applied for. Counsel says that the corporate authorities have adopted ordinances, and now refuse to comply with them. His contention in this respect seems to be based upon that provision of the ordinance of 1870, hereinbefore quoted, which says: "On compliance with the foregoing requirements a license shall be issued to the applicant," and upon a construction of the ordinance of February, 1897, as neither adding to or modifying the former ordinances. The position is taken that it was at all times the duty of the council to order the issuance of each license, but that the ordinances on the subject must comprise a general rule applicable alike to the cases of all applicants.

If the original ordinance should be held to have had the effect contended for, and as having made the issuing of a license imperative upon the council when an applicant had complied with its conditions, then we are not able to assent to the construction which counsel for relator

places upon the ordinance of 1897. Its effect and clear meaning is that as to all places within the specified locality, in addition to the applicant's compliance with the other municipal requirements, he must obtain the special permission of the city council. Unless such permission has been obtained, the applicant has failed to bring himself within the conditions prescribed by the ordinances.

Whether the ordinance is one which may lawfully be adopted and executed depends upon the power conferred upon the city by the charter, and a consideration of the legality of such a discretion if it proceeds from legislative authority.

The charter invests the city in its corporate capacity with authority and power to enact ordinances to "levy and collect taxes on * * * dram shops, saloons, liquor sellers, * * * and regulate the same by ordinance." (Sec. 161, Rev. Stat.) Several other occupations and kinds of business are specifically mentioned in the subdivision of the section quoted from. It is conceded, and indeed insisted on behalf of relator that the power to tax, as given by that particular section, includes authority to license. The authority "to regulate the same by ordinance" counsel dismisses from consideration, apparently on the ground that it must be held to refer only to the occupation or business last named; viz., "shows, theaters, and all kinds of exhibitions for pay." This court did not take that view of it in the case of City of Cheyenne v. O'Connell, 46 Pac., 1088; 6 Wyo., 491, and we do not now conceive such view to be the correct one. The clear intent and meaning of the provision is that as to all the occupations and kinds of business mentioned in the subdivision, the city may enact ordinances not only to tax but to regulate. We agree that the power to license is included in the power to tax and regulate. Other provisions of the charter authorize the property employed in the several occupations to be taxed upon an assessed value for general revenue purposes, and the evident intent and force of this

particular provision is to permit an occupation tax, or to require a license for the privilege of carrying on the same, and to otherwise regulate such occupations.

The Legislature has not attempted to regulate, in any manner, the matter of municipal licenses. The general law concerning county licenses does not affect the power which has been conferred upon various cities and towns to require a license for the sale of liquors within their respective limits. If a municipal license is provided for by any municipality in lawful pursuance of its charter powers, it is in addition to the county license. Where both are provided for, one must possess both to lawfully sell liquors within the corporate boundaries.

It is now well and conclusively settled that the Legislature may not only regulate and restrain the sale of intoxicants, but may entirely prohibit the same. It possesses the fullest and amplest powers in that respect. (Mugler v. Kansas, 123 U. S., 623; Ex parte Levy, 43 Ark., 43; Black on Intox. Liq., Secs. 34, 37, 39.) Authorities might be multiplied, but the principle is now too well established to require further reference to them.

It is likewise settled law that such power may be delegated to municipal corporations, in the absence of constitutional restrictions, to be operative within their respective limits; and this is true, notwithstanding that the subject has already been provided for by the general laws of the State. (Black on Intox. Liq., Sec. 217; 1 Dillon Mun. Corp., 4th ed., Sec. 308.)

The Legislature may confer a lawful discretion upon boards and officers appointed to grant liquor licenses. This proposition is not denied, but it is urged that unless such discretion is conferred, none exists. We need not dispute such contention. The question, however, may often arise whether the discretion in any case exists. It has been held to have been conferred in very many cases under varying forms of legislation, but a discussion of the cases at this time will hardly be useful. They may be found collated in Black on Intox. Liq., in notes to Secs.

170–172. The city of Cheyenne by its ordinances has retained, or granted to the council a discretion, at least in respect to a certain locality.

There can be no doubt but that where a municipality has legislative authority for such purpose, it may restrict the localities within which intoxicating liquors may be sold, and that the character of persons to whom licenses for the sale thereof shall be issued, may be prescribed. The city of Cheyenne, in its corporate capacity, has been given complete authority to enact ordinances to regulate the sale of liquors within its limits.   The charter also authorizes the enactment of ordinances to prevent and remove nuisances (Sec. 161, R. S., subdivision 7); to prescribe limits within which "dangerous, obnoxious, or offensive business may be carried on" (Subdivision 18); to restrain, prohibit, and suppress tippling shops, * * * and other disorderly houses, * * *. and all kinds of public indecencies (subdivision 4), in addition to the power contained in what is generally known as the general welfare clause.

Although it is not necessary to resort to any other statutory authority than that contained in subdivision 3, the above provisions are referred to as exhibiting the very ample powers bestowed upon the municipality for the purpose of maintaining its internal peace and good order.

The entire argument on behalf of the relator is based upon the assumed absence of a discretion of any character in the municipal authorities.   The assumption is erroneous.

The Legislature conferred upon the city the power to enact ordinances regulating the subject, to the same extent, possibly short of entire prohibition, as the Legislature itself could have done by a direct and comprehensive statute.   In pursuance of that power, the city has enacted ordinances which vest in the council a certain discretion as to a stated locality.

The question, nevertheless, arises whether or not the

regulations, so far as the nature of the discretion is concerned, are lawful, and whether such discretion has been lawfully exercised in the present instance.

It is a fundamental principle that there is no inherent right in a citizen, or any one, to sell intoxicating liquors by retail, and that there is not a vested right in any person to have a liquor license.  (Crowley v. Christensen, 137 U. S., 86; Ex parte Levy, 43 Ark., 42.)  "As it is a business attended with danger to the community it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils.  The manner and extent of regulation rest in the discretion of the governing authority.  That authority may vest in such officers as it may deem proper the power of passing upon applications for permission to carry it on, and to issue licenses for that purpose.  It is a matter of legislative will only."  Crowley v. Christensen, supra.

The precise question arising in the case at bar has engaged the attention of the courts in a number of adjudicated cases, and they unite in upholding a law or municipal ordinance such as we have in this case, and a reasonable exercise of the authority and discretion granted or retained thereby, as applied to the sale of intoxicating liquors, unless the regulation comes in conflict with some general law, or the discretion is exercised arbitrarily and without any consideration or reason in an individual case.

The city and county of San Francisco possessed the power, under the constitution, to make "all such local, police, sanitary, and other regulations as are not in conflict with general laws."  An ordinance of that municipality provided that no liquor license should be issued unless the applicant should have obtained the consent of a majority of the board of police commissioners to carry on the business, or in case of the refusal of such consent, then upon the written recommendation of not less than twelve citizens of San Francisco owning real estate in the block or square, in which the business is desired to be carried on.  No material distinction between that and the

Cheyenne ordinance is to be observed upon principle. Said ordinance came before the supreme court of California and the Supreme Court of the United States. Ex parte Christensen, 85 Cal., 208; Crowley v. Christensen, 137 U. S., 86. The case of Yick Wo v. Hopkins, 118 U. S., 356, relating to a laundry ordinance, was relied on in each case to defeat the liquor ordinance. The objection made was that the license depended upon the arbitrary will of the police board in the first instance, and of the twelve property owners in the second. The following was said in the opinion in Ex parte Christensen: "Whatever force this objection might have in reference to licenses to carry on the ordinary avocations of life, which are not supposed to have any injurious tendency, it has no force in the present case," and Mr. Justice Field in Crowley v. Christensen in his opinion sustaining the ordinance, and a refusal to grant a license distinguished the case from Yick Wo v. Hopkins, supra, by saying, "It will thus be seen that that case was essentially different from the one now under consideration, the ordinance there held invalid vesting uncontrolled discretion in the board of supervisors, with reference to a business harmless in itself and useful to the community; and the discretion appearing to have been exercised for the express purpose of depriving the petitioner of a privilege that was extended to others. In the present case the business is not one that any person is permitted to carry on without a license, but one that may be entirely prohibited or subjected to such restrictions as the governing authority of the city may prescribe." The license was refused in the two cases just alluded to for the reason that larcenies had been committed in the place kept by the applicant.

An ordinance of the city of Grand Rapids, Michigan, required every applicant for a liquor license, in addition to other conditions, to obtain the consent of the common council. The charter authority was "to enact such ordinances, by-laws, and regulations as they deemed desirable, * * * to restrain license and regulate saloons, and

to regulate and prescribe the location thereof." This is not essentially different from the power to license and regulate, but as has been seen, Cheyenne is empowered to prescribe limits within which an obnoxious or offensive business may be carried on. An application was refused on account of the objectionable locality; and the court declined to require by mandamus the city authorites to grant the license. Sherlock v. Stuart, 96 Mich., 193; 21 L. R. A., 580. An objection made to the ordinance in that case, was that the regulation should have been made by a general ordinance fixing districts within which saloons may be kept, and that the council did not possess the power to hear and determine each individual case. It was held that the ordinance was authorized, and that the other conditions such as giving a bond, presenting a petition, and kindred matters, did not limit the discretion, but prescribed merely a method of procedure. The cases cited in the dissenting opinions in that case do not in my judgment sustain their view. Some of them arose in respect to legitimate and useful avocations, such as dairies, slaughter houses, and the like, and others like Amperse v. Kalamazoo, 59 Mich., 78, to a case of the arbitrary refusal of a village or town board to approve a bond where the board had nothing else to do under State law concerning licenses but to approve the bond; the license not being issued by or under authority of the board.

The mayor of Chicago refused a liquor license for a place in the midst of a dwelling-house district, and the appellate court sustained him, holding "that a court should not by mandamus compel the public officials to issue a license for the keeping of a saloon in a residence neighborhood, where a saloon will be a nuisance." Swift v. The People, 63 Ill. App., 453. That decision was rendered notwithstanding the case of Zanone v. Mound City, which will be referred to.

The council of Salt Lake City, Utah, had power "to license, regulate, and tax" the sale of intoxicating liquors. A municipal ordinance required a petition by an applicant

for liquor license to be presented, in which the place of business, and some other minor matters of fact, were required to be stated, and also a bond.  It was held that the council could in its discretion refuse a license, although the applicant had complied with the ordinance in respect to petition, bond, etc.  (Perry v. City Council, etc., 7 Utah, 143.)  The legality of a discretion, which may be exercised in each individual case is also sustained in many other cases, but a citation of the following, the facts of which more closely approach those in the case at bar, will subserve all useful purposes.  (Trageser v. Gray, 73 Md., 250; Perkins et al. v. Ledbetter, 68 Miss., 68; Commissioners v. Commissioners, 107 N. C., 335; Board v. Smith, 110 N. C., 417; Commonwealth v. Moran, 148 Mass., 453.)  The case of Ex parte Levy, 43 Ark., 42, is also in point.  It was held in that case that a law which would limit the number of dram shops, authorizing the selection of such limited number in some manner, would not be void as creating a monopoly in the sense of the constitutional prohibition, but would be rather a police regulation for the public good.  In view, however, of the constitutional inhibition of that State, against the granting to any citizen or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens, the court held that the discretion of the county court over liquor licenses extended only to determine whether the applicant had complied with all the requirements of the law, and is of good moral character, and that upon a refusal to grant a license the grounds should be shown, so that it might be seen whether or not the court had exercised a sound legal discretion in the matter.  In that case the application was under a general law of the State, and no question of regulation under municipal charters or ordinances was involved.  It is a well-considered case, and not in conflict with our conclusions herein.  The discretion to determine the moral fitness of the applicant to receive a license was recognized as a proper one, and that a discrimination between those

worthy and unworthy of receiving the privilege was not unlawful. The question of location did not arise in the case.

There are cases which announce the general doctrine that where privileges are granted by law they should be open to the enjoyment of all upon the same terms and conditions. So far as that principle, when given its broadest significance, is held to forbid a municipal corporation to make any discrimination between applicants for license to conduct or carry on a particular business, it has usually been applied in the case of such industries or avocations which are necessary to the well-being of the community and harmless in themselves, but by reason of the character of the employment require municipal regulation. A clear distinction, however, is generally recognized between such occupations, and the business of selling intoxicating liquors, the latter being one which, in the exercise of the police power of the State, may be entirely prohibited.

We do not therefore conceive it either necessary or desirable to attempt any review of the decisions relating to the former class of employments.

A case which has denied the power of a municipality to refuse a liquor license to one who has complied with the procedure and conditions prescribed by law, is ex parte Theisen, 30 Fla., 529. That case, however, is easily distinguishable from Crowley v. Christensen and the others in harmony with it. The Florida court referred to those cases, and as a feature which distinguished them from ex parte Theisen, mentioned the fact that the statutes of the State contained specific regulations relating to the sale of liquors, and the issuance of municipal licenses therefor, and the court said, "Our decision in the case at bar rests upon the conclusion that the grant to municipal corporations to regulate and restrain, will not permit the enactment of an ordinance under which arbitrary discrimination may be made in respect to matters which are exclusively under statutory control and regula-

tion.   In the absence of an express declaration of intention to that effect, it must not be assumed that the Legislature proposed by the grant of power to municipal corporations to regulate and restrain retail liquor dealing to confer upon them the power to contravene and defeat State policy by ordinances inconsistent with the laws of the State on the subject.''

The case of Zanone v. Mound City, 103 Ill., 552, is cited as authority against the validity of the refusal of the license to relator in the case at bar.   In that case, however, the municipal authorities offered no sort of excuse, justification, or explanation of their action in refusing the license, but they rested upon what was contended to be their power of arbitrary discrimination.   The ordinances did not provide for the previous consent of the board. All that the case decides is that the corporate authorities could not exercise an arbitrary discrimination, and could not refuse a license through mere caprice.   It was not denied but that the city might limit the number of dramshop keepers to be licensed, or refuse licenses to ''persons of such habits and character as render them unfit persons to be licensed;'' but the court says that the authorities had not decided that the applicant was an unfit man.   It was said as to limiting the number of licenses that it should be done by ordinance, and in such a way as to avoid favoritism and monopoly.   Three of the justices dissented in that case.   The case of Swift v. The People supra was decided subsequently to that of Zanone v. Mound City, and the appellate court, evidently, did not consider the latter case as denying the principle that for good reasons the authorities of the city could refuse a license for a place which would be detrimental to the best interests of the municipality and its citizens.   As good, if not stronger, reasons may exist for discrimination as to the place where liquor shall be permitted to be retailed in an incorporated town, as for such a discrimination between individuals based upon personal fitness.

In the case at bar the council has not refused the license

through mere caprice, nor have they attempted an exercise of mere arbitrary discrimination. Their answer to the alternative writ of mandamus disclosed at length the reasons for their action. Two other applicants had been refused who desired to carry on the same character of business in the same place or locality. They did not discriminate against the relator individually. He had selected a place which the council insists would, judging from the past, endanger the peace and good order of the community. While the pleadings and statements of facts are not very definite as to the comparative location described with reference to the other business locations in the city, enough, perhaps, appears to indicate that the proscribed limits and the place selected by the applicants are not contiguous to the business districts.

We conclude, therefore, that under the charter authority to enact ordinances to tax and regulate, the city possesses the power to license saloons and liquor sellers; to regulate the same by ordinance by prescribing the locality or localities in which such business shall be permitted, and to provide by ordinance that the consent of the council shall be obtained before the issuance of a license for the sale of intoxicating liquors within certain limits, and that the ordinance of February, 1897, has that effect, and that the same is valid. We have not much, if any, doubt but that the discretion should be reasonably and soundly exercised; it should not be enforced merely as a matter of caprice, but the action of the council should appear to be based on reasons. It does so appear in the case at bar.

These considerations must necessarily dispose of the controversy, and must result in a denial of the writ prayed for. It should perhaps be mentioned that the county license which relator held, running from May, 1897, to May, 1898, did not permit him to sell within the city, but was issued for a place outside the municipal limits. He had applied for, was willing and ready to acquire, but had not received, a license from the county authorities to operate within the city.

The following in connection with what has been said will sufficiently answer such of the reserved questions as are pertinent to the points we have considered, without returning specific answers to individual questions.

The charter authorizes the city to enact ordinances regulating the matter of granting licenses for the selling at retail of intoxicating liquors, and in pursuance of that authority the ordinances may vest a discretionary power in the council, the same to be reasonably exercised, as to the place or places where such sale, within the city, shall be permitted or denied, and may prescribe the locality or district within which said sales may be, and without which may not be, licensed; and that the council, upon the facts and circumstances set forth in the agreed statement of facts, had authority to refuse to issue a license to the relator, notwithstanding that he should give a sufficient bond conditioned as required by the ordinance.

CORN, J., and KNIGHT, J., concur.